## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF SOUTH CAROLINA
### CIVIL ACTION NO.: _____

| | |
|---|---|
| CAPITAL RESORTS GROUP, LLC d/b/a CAPITAL VACATIONS, a Delaware limited liability company, | |
| Plaintiff, | **COMPLAINT FOR** |
| | **INJUNCTIVE RELIEF AND DAMAGES** |
| vs. | (Jury Demand) |
| WESLEY FINANCIAL GROUP, LLC, a Tennessee limited liability company, and CHARLES WILLIAM MCDOWELL III, | |
| Defendants. | |

Plaintiff CAPITAL RESORTS GROUP, LLC d/b/a CAPITAL VACATIONS, a Delaware limited liability company ("CV"), files this Complaint for Injunctive Relief and Damages against Defendant WESLEY FINANCIAL GROUP, LLC ("Wesley"), a Tennessee limited liability company, and CHARLES WILLIAM MCDOWELL III ("McDowell," and together with Wesley, "Defendants") and state:

### INTRODUCTION

1.      CV is headquartered in Myrtle Beach, South Carolina and markets, sells, and/or manages more than 200 vacation destinations throughout the world that customers can book by using Capital Points sold by CV and its affiliates, including over a dozen resorts in South Carolina and over a dozen in North Carolina.

2.      Wesley's business model—and that of the other inhabitants of the timeshare cancellation cottage industry—violates traditional business norms. Except for North Carolina's currently unique law, Wesley is a completely unregulated and unrestrained business whose sole purpose is to cancel another business's existing contracts. Wesley has made a business of and monetized the tort of tortious interference with contract. Wesley targets and disrupts contracts

1

between timeshare companies, like CV, and their customers. Wesley exacts exorbitant, up-front fees for its "services." Wesley, and similar companies, refer to this as timeshare "exit" services.

3.    Wesley's CEO is Defendant Charles "Chuck" McDowell, III. While McDowell touts himself as a pioneer in the timeshare exit industry who has "fought and won" for timeshare owners in federal court, in reality, he is selling magic beans, as the promises that he makes on behalf of Wesley are either false, meaningless, or both, and in the end the customer is left in a worse position than had they not contracted with Wesley.

4.    Wesley's aggressive television, radio, social media, and internet advertising campaigns often feature McDowell without revealing his checkered financial past that includes:

- Three (3) bankruptcy filings;

- Eight (8) federal tax liens;

- Thirteen (13) civil and debt collection lawsuits;

- Two (2) worthless check charges;

- Vice-President of Sales of "timeshare exit" scam whose principals and nine others were indicted, with the principal sentenced to twenty-seven (27) years in prison; and

- ChuckLuck.com, a sports betting "investment adviser," through which McDowell guaranteed his customers a profit, started McDowell's pattern of false guarantees of results and ignored demands for the promised refund, The ChuckLuck.com false "guarantee" became a central theme of McDowell's promotion of Wesley. ChuckLuck.com, amid a legion of angry and vocal bettors denied their promised refunds, mutated into SmokeyWins, a sports betting tout of no greater repute.

5.    Through Wesley's aggressive television, radio, and internet advertising campaign, as well other marketing tactics, Wesley makes false and misleading promises with a "100% money back guarantee" that Wesley can legitimately relieve timeshare owners of their obligations, including owners of CV timeshare interests.

6.      Wesley's advertising sends a consistent, deceptive, message: Wesley will cancel a timeshare owner's timeshare interest by utilizing Wesley's process, 100% money-back guaranteed.

7.      But Wesley has no legitimate process. Wesley is not a law firm and employs no lawyers other than its in-house counsel. Wesley's "process" involves a supposed but illusory evaluation of potential rescission claims, blatant misrepresentations about the timeshare owner's existing contractual obligations, false predictions about the timeshare owner's future obligations, and then promising, directly or indirectly, that the owner can "rescind" his or her timeshare ownership by utilizing Wesley's "process" (in exchange for paying a hefty advance fee).

8.      Wesley's customers are always, first, the customer of a timeshare company. When the customer inquires further about Wesley's services, Wesley engages in an elaborate misdirection designed to deceive the customer into believing that Wesley is searching for grounds that would support a "legal" cancellation of the timeshare interest, while knowing that Wesley never intended to pursue it, to the extent it exists. The customer is instructed to keep its relationship with Wesley a secret, while sending timeshare companies, such as CV, ghostwritten emails, letters, or other communications requesting to be released from their timeshare interest based on generalized allegation of deception during the sales process, all scripted by Wesley. The ruse deceives timeshare owners so they wrongly believe that they are generating leverage that will allow them to legally negotiate a surrender of their timeshare interest, when Wesley knows all along that it will simply direct the customer to breach its timeshare contract by stopping payments, exposing the owner to the risk of negative credit reporting, foreclosure, a money judgment, or worse.

9.      As set forth below, Wesley uses false advertising to lure potential customers, and then it engages in a slew of deceptive and unfair practices, harming the customers and the timeshare companies, including CV. These deceptive and unfair practices include

misrepresentations by Wesley that it only accepts as customers those timeshare owners who claim the timeshare seller misrepresented the timeshare to them at the point of sale. Wesley falsely leads these timeshare owners to believe that, supposedly because of that claimed misrepresentation, the timeshare owner is justified in stopping payments on contracts it signed, and Wesley will be able to procure a cancellation of the timeshare. This is the ultimate ruse designed to line Wesley's, and McDowell's, pockets because no customer would otherwise pay Wesley thousands, often tens of thousands, of dollars to either default on their payment obligations or to participate in CV's Graceful Exit Program, designed for those who have fully paid for their timeshares interest.

10.    For most timeshare owners who have a mortgage or otherwise owe a balance on their timeshare, non-payment is the route to cancellation, and Wesley will tell the timeshare owners whatever is necessary to induce non-payment, even at one point promising credit repair and other credit-related services in violation of numerous state and federal laws. Despite this, Wesley still leads the customer to believe that the cancellation for non-payment has something to do with the timeshare owner claiming that the timeshare seller misrepresented the timeshare at the point of sale, when clearly it does not.

11.    For those timeshare owners who do not have a mortgage, Wesley does not need to induce non-payment, as Wesley's plan is to have the timeshare owner request voluntary relinquishment of the timeshare through CV's voluntary relinquishment program, something the customer could do without Wesley and without paying Wesley thousands of dollars. In most instances, however, Wesley still leads the customer to believe that this voluntary relinquishment has something to do with the timeshare owner claiming that the timeshare seller misrepresented the timeshare at the point of sale. But clearly it does not, especially since in most of such instances the timeshare owner purchased its timeshare interest a decade or more earlier and fully paid for and used its timeshare interest without regard to Wesley's false narrative.

12.     Wesley makes false and misleading promises with a "100% money back guarantee" that Wesley can legally relieve timeshare owners of their obligations, including owners of CV's Capital Vacations Club timeshare interests. Wesley constructs an elaborate illusion that it is searching for grounds that would support a "legal" cancellation of the timeshare interest, while knowing that Wesley cannot and never intended to pursue any such grounds. Wesley is not a law firm and it knows that it could do nothing "legally" with any such information obtained. This is one more of the many deceptions Wesley perpetrates on its customers.

13.     Central to Wesley's business model is that its customers must pretend, under threat of forfeiture of exorbitant fees already paid to Wesley often years before, that the customer is not working with Wesley, certainly a unique and counterintuitive feature for any consumer-facing business. Wesley relies so heavily on secrecy that its contract with *all* its customers—not just CV owners—mandates that the timeshare owner lie about hiring Wesley, making it a breach of contract and a forfeiture of the advance fee they have paid should the customer divulge its relationship with Wesley. The Service Agreement between Wesley and its customers includes an express admonition, in bold and all caps, that the customer must lie to CV and conceal its relationship with Wesley:

> **THE TERMS, CONDITIONS AND EXISTENCE OF THIS SERVICE AGREEMENT ARE CONFIDENTIAL AND YOU AGREE NOT TO DISCLOSE TO ANY PERSON OR ENTITY (INCLUDING BUT NOT LIMITED TO ANY PERSONS WORKING FOR OR AFFILIATED WITH THE TIMESHARE ENTITY) THAT YOU HAVE ENTERED INTO THIS SERVICE AGREEMENT OR ANY OF THE TERMS THEREOF. ANY BREACH OF THIS PARAGRAPH 7.c OR ANY BREACH OF PARAGRAPH 1.b. OF THIS SERVICE AGREEMENT OR ANY DISCLOSURE BY YOU TO ANY PERSON OR ENTITRY THAT [WESLEY] OFFERS A 100% MONEY BACK GUARANTEE IN THE EVENT YOUR PURCHASE AGREEMENT IS NOT TERMINATED WILL GIVE [WESLEY] THE RIGHT TO IMMEDIATELY TERMINATE THIS**

5

**SERVICE AGREEMENT BY WRITTEN NOTICE TO YOU AND [WESLEY] WILL NOT BE REQUIRED TO REFUND ANY PORTION OF THE FEE TO YOU DUE TO THE BREACH OF THIS PARAGRAPH 7.c. OR THE BREACH OF PARAGRAPH 1.b.**

14.     Wesley operates under this veil of secrecy because it knows that timeshare companies often do not respond to abusive, advance-fee so-called "cancellation" companies like Wesley. So Wesley demands their customers never disclose Wesley, while ghostwriting emails, letters, and other communications for the owners to send to the timeshare companies and other third parties, requesting to be released from their timeshare interest based on generalized allegations of deception during the sales process, all scripted by Wesley to conceal itself. Wesley's scheme is indiscriminate—it is the same for CV as it is for any other timeshare operator and it is the same for all of its customers, regardless of any specific customer's individualized issues.

15.     The next step in Wesley's scheme is to suppress all communications between the timeshare operators and its customers:

> What to do when the timeshare company calls: Our best advice is not to answer their calls (feel free to block their number). If you do happen to answer, our advice is to say something along the lines of, 'Hey, if you need to speak to me, please contact me in writing.' Hang up and leave it at that – you are not obligated to speak to them.

Wesley also instructs the timeshare owner: "do not respond to the timeshare company without getting specific instructions on what to say/do from Wesley."

16.     Instead of engaging with CV regarding options like the Graceful Exit Program, Wesley induces the timeshare owners to stop making payments on their debts, warning, in fact, that continuing payments will make the process take longer, and, for a time, assuring customers that Wesley will take care of any negative consequences, including through credit repair services Wesley has offered. Wesley even provides detailed instructions of how to cancel automatic payments depending on the method of payments the customer has established with the timeshare

developer. Wesley exposes the timeshare owner to delinquency and default because Wesley's business model relies on the timeshare company foreclosing on customers in default because Wesley cannot pursue legal action to cancel the timeshare.

17.     In almost all instances, Wesley imposes and collects its entire fee long before the timeshare owner receives any benefit, if he or she ever does.[1]  Wesley justifies its up-front fee by inducing the customer to stop paying contractual obligations, such as annual maintenance fees, taxes, or mortgage payments to their timeshare companies. Wesley knows that this will cause owners to breach their agreements with timeshare companies, including CV.

18.     Through its scheme, Wesley extracts exorbitant fees from its customers, completely untethered to the value of any service Wesley supposedly provides. And by precipitating a default by the customers of their obligations to CV, Wesley subjects those customers to the risk of adverse legal actions—such as foreclosure and other available legal remedies—and potentially ruinous credit reporting. Wesley then brazenly claims hundreds of millions of dollars in victorious "mortgage debt relief" services for its customers.

19.     Defendants lure their customers by false promises in their advertising on their website         (originally,         https://timesharecancellations.com/,         but         now https://wesleyfinancialgroup.com; the original website re-directs to the current website). Wesley also floods social media: Twitter (now "X") (continuously), hundreds of Facebook ads, numerous YouTube videos, and radio and television (featuring Wesley's owner, Chuck McDowell) with false advertising of its illusory service.

---

[1]     There are other ***legitimate*** federal and state regulated businesses that help their customers reduce or eliminate debt or repair credit damaged by inaccurate credit reporting, two things that Wesley has also promised to do. Debt relief providers, credit repair businesses and the like differ from Wesley and other wholly unregulated timeshare cancellation businesses in many ways, but one in particular stands out: the advance fee ban. Unlike Wesley and its ilk, debt relief providers and credit repair organizations are prohibited from being paid until the customer receives the promised result. *See, e.g.* the Telemarketing Sales Rule, as amended, 16 C.F.R. Part 310, and the

20.     Wesley's use of false and misleading advertising, and its deceptive and unfair trade practices, have played a material and substantial part in Wesley inducing existing CV's members to breach existing contracts with CT, default on obligations to CV, and cease doing business with CV. Wesley must induce its customers to stop paying what they owe to CV because Wesley knows that its so-called "proprietary"[2] process does not work and the path to the cancellation of a customer's timeshare contract is that CV do it itself through foreclosure or other recovery procedures.

21.     Wesley has a contrived process to qualify its prospective customers, which requires the prospective customer to agree with Wesley's suggestions that the customer has a grievance against the timeshare company, whether true or, far more frequently, concocted by Wesley's insistent questioning. Regardless of whether the customer has such a grievance, this is part of Wesley's sales process, leading the customer to believe that they have a grievance that Wesley could do something about it—it cannot, because it is not a law firm—and misleading the customer to believe that the customer's grievance is the reason why the timeshare will be cancelled.

22.     Wesley justifies its fee by inducing the customer to stop paying their contractual obligations, including annual maintenance fees, taxes, or mortgage payments to their timeshare companies. Wesley then factors the money the customer will no longer be paying on its obligations to CV into computing its fee, the amount of which has little to do with the quantity or value of the services Wesley claims to provide.

---

Credit Repair Organization Act, 15 U.S.C. §§ 1679, *et seq.* Wesley on the other hand gets paid irrespective of whether it produces a result.

[2]     https://wesleyfinancialgroup.com/company-updates/2023-great-place-to-work-certification/ (November 1, 2023).

## PARTIES

23.     Plaintiff CAPITAL RESORTS GROUP, LLC d/b/a CAPITAL VACATIONS, a Delaware limited liability company, is a company with its principal place of business located in Myrtle Beach, South Carolina. Its sole member is Capital Vacations, LLC, a Delaware limited liability company with its principal place of business located in Myrtle Beach, South Carolina. Capital Vacations, LLC's members consist of limited liability companies, a profit-sharing plan, and an investment account. The members of the limited liability companies, profit-sharing plan, and investment account are all individuals or a family trust, with one exception where a limited liability company is the member and a family trust is the member of that limited liability company. All of the individual members of these sub-members of Capital Vacations reside and are domiciled in South Carolina, Florida, Missouri, California, and Massachusetts. The two family trusts have trustees that reside and are domiciled in South Carolina. CAPITAL RESORTS GROUP, LLC is therefore a citizen of South Carolina, Florida, Missouri, California, and Massachusetts.

24.     Defendant WESLEY FINANCIAL GROUP, LLC, a Tennessee limited liability company, is a company with its primary place of business located in Franklin, Tennessee. Its sole member is Charles William "Chuck" McDowell III, an individual residing and domiciled in Tennessee. Wesley is a citizen of Tennessee.

25.     Defendant Charles William "Chuck" McDowell III is an individual residing and domiciled in Tennessee. McDowell is a citizen of Tennessee.

## JURISDICTION

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are completely diverse, and the relief sought satisfies the amount in controversy requirement.

27.    Complete diversity exists because Plaintiff is a citizen of only South Carolina, Florida, Missouri, California, and Massachusetts and Defendants are both citizens of only Tennessee.

28.    With respect to the amount in controversy, and as set forth in greater detail below, CV seeks monetary damages in excess of $75,000. Further, CV seeks injunctive relief that would prohibit Wesley from engaging in conduct that results in Wesley collecting fees well in excess of $75,000. The value of this relief to CV greatly exceeds $75,000 because it would prevent CV timeshare owners from becoming Wesley customers and defaulting on payment obligations to CV. The value of this relief to Wesley greatly exceeds $75,000 because it would prevent Wesley from collecting or retaining all or part of fees it customarily charges to customers, in the range of tens of millions of dollars per year.

29.    This Court may exercise personal jurisdiction over Wesley because Wesley advertises its services in South Carolina to South Carolina residents, provides timeshare exit services to South Carolina residents, induces breaches of contract between CV, located in South Carolina, and its customers, causes harm that is realized in South Carolina, and the causes of action asserted herein arise from that conduct and contacts with South Carolina. The Court may exercise personal jurisdiction over McDowell because he owns, controls, and directs Wesley's business and causes its actions and contacts with South Carolina, its residents, and its businesses.

30.    This Court has the authority to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## **VENUE**

31.    Venue is proper in the District of South Carolina pursuant to 28 U.S.C. §1391, because a substantial part of the events giving rise to CV's claims occurred in South Carolina, as set forth herein.

## GENERAL ALLEGATIONS

**A.     The CV Timeshare Purchase**

32.     CV has entered into timeshare ownership purchase contracts with numerous customers, dating back many years, and both CV and the customers are performing under those contracts.  Regardless of any theory Wesley may suggest, to a customer or otherwise, that could conceivably be used to invalidate a timeshare contract if properly alleged in an appropriate proceeding and proven, Welsey never actually does that. Wesley is not a law firm, and it cannot lawfully evaluate such claims, consult with customers regarding the merits of such a claim, actually bring such claims, or prosecute such claims. And Wesley does not and has never employed lawyers for their customers to do so. Thus, such theories, which are central to Wesley's business model, are wholly immaterial in this context because Wesley cannot do anything about it and has never even attempted to do so. Wesley's statements and implications to the contrary to CV's owners are thus false and deceptive.

33.     At the time of a timeshare purchase from CV, each purchaser executes a written purchase agreement ("Purchase Agreement") with a "Vacation Interest Seller" that is authorized by CV to sell timeshare estates in the Capital Vacations Club's component site resorts. Pursuant to the terms of the Purchase Agreement, purchasers also become "Member Beneficiaries" or "members" in the Capital Vacation Club, which provides the members with a certain number of "Capital Points" that can be utilized to use and occupy the accommodations and facilities within the Capital Vacations Club. The members also agree as part of the Purchase Agreement to be responsible for other obligations.

34.     If a purchaser desires mortgage financing, he or she may apply for and receive a mortgage as part of the Purchase Agreement. If financing is obtained, a purchaser will execute and deliver a promissory note and mortgage to CV in connection with the timeshare purchase.

35.     The Purchase Agreements and the CV owners' compliance with their contractual obligations (including timely and complete payments) are of utmost importance to CV's business.

B.     **Defendant's Scheme**

36.     Wesley is engaged in a timeshare cancellation scheme with no legitimate foundation designed to induce existing CV owners to breach their Purchase Agreements with, and related obligations to, CV in order to steer CV owners to instead pay large, upfront fees to Wesley for Wesley's pecuniary gain.

37.     McDowell, as Wesley's self-proclaimed founder, originated and devised Wesley's fraudulent scheme and has personally implemented or directed others to implement and execute Wesley's fraudulent scheme. McDowell directs and controls Wesley's activities which are the subject of this lawsuit and/or controls others whom McDowell has directed to do so. Accordingly, as used throughout this lawsuit, all actions attributable to Wesley are also attributable to McDowell, and he is equally responsible and liable to CV. Wesley and McDowell may, as the context dictates, be referred to collectively as "Wesley."

38.     Wesley implements its scheme by luring unwitting CV owners to hire Wesley through false and misleading marketing, including claims made in television, radio, and internet advertisements in South Carolina, as well as on its original website https://timesharecancellations.com/ and current website https://wesleyfinancialgroup.com (the "Website"). The original website re-directs to the current website. The Website prominently advertises "guaranteed timeshare cancellation," and "guaranteed cancellation." It has at various times stated, "we know how to get out of a timeshare successfully." And, the recurring theme, on the Website and elsewhere, is that Wesley has a "thorough vetting and review process," and that potential customers must be qualified, misleading potential customers to believe that whatever supposedly qualifies them for Wesley's purported service justifies legally stopping payments,

and will also form the basis of the supposed cancellation. But Wesley is not a law firm and does not have a legally cognizable method of actually accomplishing what it promises. So the "vetting" process loudly trumpeted and oft repeated by Wesley has no function other than to mislead and deceive the prospective Wesley customer.

39.    In its radio advertisements that have been broadcast in many different times and places throughout the country, including especially within this District, Wesley also offers the misleading and deceptive "100% guarantee" that it will "cancel your timeshare legally."

40.    On Facebook™, Wesley solicits customers with deceptive, misleading, and/or outright false statements designed to alarm timeshare owners, such as:

Your Maintenance Fees Will Rise for Eternity

According to America's Resort Development Association – timeshare maintenance fees rise by an average of 8% per year.

That 'small' $500 per year payment will balloon into a much bigger $1,000 per year payment in only 8 years.

And it will skyrocket to a massive $2,000 per year payment in 18.

Don't forget: this is the same timeshare you are paying $500 per year for right now.

….

You might think this won't matter because 18 years is a long time from now. But it will.

…
You Children WILL Receive Your Timeshare When You Pass

Three words:

"Contract in Perpetuity"

I had to use google to learn what those three words mean.

In fact – they use these words because they don't want you to know what they mean.

Because if you did know – you wouldn't have signed the bottom line.

"In perpetuity" simply means "forever".

This means your children are stuck with your timeshare after you pass.

Timeshare has infected your family tree – and will remain there forever…

41.     The Facebook™ advertising then goes on to offer the customer a package that includes information on "How to get rid of timeshare – legally & completely," something Wesley knows is false as it has never had any process to "legally & completely" cancel a timeshare contract.

42.     In December 2020, Wesley released a short film, "Timeshare WARrior" which is free to watch on YouTube™, and which Wesley also directs all potential customers to watch in advance of a sales call with Wesley (TIMESHARE WARRIOR: The Chuck McDowell Story - YouTube). The film, which remains available on YouTube™, like all of Wesley's advertising, perpetuates the lie that Wesley utilizes a "legal" method to get timeshare owners out of their obligations, and that Wesley will evaluate whether a timeshare owner has a legal basis to stop making payments and a legal basis for having their timeshare cancelled.

43.     Other advertisements on its Website have stated that Wesley "know[s] how to get out of a timeshare successfully", and that Wesley "guarantees that those people who are accepted as customers will have their timeshare terminated within the contractually agreed upon time period." Wesley's online advertising assures owners that "there are certain methods that a qualified timeshare owner can do or have done for them that can bring the timeshare companies virtually to their knees," proclaiming that, for the "30,000 timeshare owners we have helped over the past 10 years, we have a near perfect success rate."[3]

44.     Wesley further touts itself as "one of the only – if not the only – company that has over 2,000 5-star reviews."[4] But, of course, Wesley fails to identify where these 5-star reviews

---

[3]     Wesleyfinancialgroup.typeform.com, Wesley Financial Group, LLC, You CAN Get Rid of Your Timeshare, https://wesleyfinancialgroup.typeform.com/to/EkcnAq?typeform (Accessed May 9, 2024).

[4]     Id.

were purportedly made, provide a link, or do anything else that would allow a customer (or this Court) to verify that claim. Wesley also does not disclose how many of these so-called reviewers were compensated.

45.     Wesley's website currently states "since 2011 we have canceled over 40,000 timeshares and eliminated over $525,000,000 in timeshare mortgage debt,"[5] underscoring the unprecedented scope of contractual disruption perpetrated by Wesley.

46.     Wesley offers misleading testimonials stating not only that its tactics will allow timeshare owners to legally cancel their contracts, but in many cases that Wesley has helped owners "cancel your mortgage" or receive substantial refunds on payments that have already been made.[6] Wesley makes these advertisements and offers these testimonials knowing that, in fact, it will simply induce its customers to breach their contracts, without, despite its illusory "vetting" process, actually evaluating whether there is a "legal" justification to do so. Wesley knows that it has not ever procured a refund from CV for any CV timeshare owner, making the promise entirely illusory as to Capital Vacation Club members.

47.     Wesley procures at least some of the testimonials and reviews, or similar public postings on which Wesley relies, by compensating the customer. This may take the form of direct cash compensation, Wesley may require it as a condition of receiving a refund of the advance paid fee that Wesely did not earn, or Wesley may require it as part of otherwise resolving a customer's dispute with Wesley, all in violation of the terms of service or similar governing policies for most review platforms. Wesley conceals and does not disclose this fact, but instead insists that customers watch and read these testimonials and reviews prior to a sales call with Wesley, pointing to these testimonials and reviews as some sort of proof of success.

---

[5]     https://wesleyfinancialgroup.com/ (Accessed May 9, 2024).
[6]     iSpot.tv, Martha Lill, Wesley Financial Group Actual Customer, https://www.ispot.tv/ad/IbK5/wesley-financial-group-martha-lill (Accessed May 9, 2024).

48.     Wesley's use of these testimonials and reviews violates several FTC pronouncements on the use of endorsements and testimonials in advertising, including 16 C.F.R. Part 255.1(a): ("Endorsements must reflect the honest opinions, findings, beliefs, or experience of the endorser"); 255.1(d): ("Advertisers are subject to liability … for failing to disclose unexpected material connections between themselves and their endorsers."); 255.2(b): ("[A]n advertiser should possess and rely upon adequate substantiation" that "the endorser's experience is representative of what consumers will generally achieve with the advertised product in actual, albeit variable, conditions of use" or "clearly and conspicuously disclose the generally expected performance in the depicted circumstances"); 255.2(d): ("In procuring, suppressing, boosting, organizing, publishing, upvoting, downvoting, reporting, or editing consumer reviews of their products, advertisers should not take actions that have the effect of distorting or otherwise misrepresenting what consumers think of their products, regardless of whether the reviews are considered endorsements under the Guides."); 255.5(a): ("When there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement, and that connection is not reasonably expected by the audience, such connection must be disclosed clearly and conspicuously" including "monetary payment or the provision of free or discounted products.").

49.     Although neither McDowell nor the Wesley Financial employees who provide advice to customers are attorneys, McDowell repeatedly and deceptively makes statements indicating that Wesley has legal expertise regarding the cancelation of timeshare contracts, stating in various online videos that "you can legally get out of your timeshare," or offering testimonials proclaiming that Wesley "know[s] all of the laws."[7]

---

[7]     YouTube, Wesley Financial Group – Sell a Timeshare – How to Sell a Timeshare, https://www.youtube.com/watch?v=YKrXGohps-A (listed as "private" when accessed on May 9, 2024)

50.     In fact, McDowell's mantra has been that he has fought in federal court for the "right to help timeshare owners cancel their timeshares" and even states that he made a "MASSIVE legal investment" to "set the precedent" allowing them to do so.[8] His Timeshare WARrior film, which is styled as a biopic of McDowell's life, promotes him as the "father" of the timeshare exit industry, and portrays his vision of a David vs. Goliath defeat of the world's largest timeshare company. The lawsuit to which he repeatedly refers, however, was an employment dispute which does not have any bearing on whether the timeshare owners to whom he is advertising have a legal right to cancel their contracts or whether Wesley's business is legal or supported by any legal precedent.

51.     When a timeshare owner reaches out to Wesley for advice, its representatives pepper the potential customer with a barrage of questions under the pretext that Wesley is investigating whether the owner was lied to or mislead during the timeshare purchase process.

52.     Whether CV actually engages in such deception, is, of course, entirely irrelevant to Wesley, as Wesley has no intention of pursuing any legal claims, legitimate or otherwise, on behalf of these owners. Instead, Wesley misleads the owner into believing Wesley is gathering evidence to support a strategy that will allow the owner to legally cancel or terminate his or her timeshare interest, so that it appears that Wesley is earning its exorbitant fees.

53.     Wesley's actual purported "legal strategy" is a hoax: inducing timeshare owners, including CV owners, to breach by stopping payments to the company. Wesley then hopes that payment default will result in foreclosure actions or the exercise of other legal remedies by which the owner forfeits its timeshare interest through a deed in lieu of foreclosure once the account reaches a certain delinquency threshold and CV offers such a deed in lieu of foreclosure.

---

[8]     Wesleyfinancialgroup.typeform.com, Wesley Financial Group, LLC, You Can Get Rid of Your Timeshare – Here's what we're going to send you, https://wesleyfinancialgroup.typeform.com/to/EkcnAq?fbclid=IwAR3GFZZ2Rxo4WAlH3D4tSTrklTuBYOmJF6sbZOCmcBPpHt7l0o2uL9lQVjo (Accessed July 31, 2019).

54.     To convince customers to stop payment, Wesley has even offered to repair customers' credit. Wesley offered the credit repair service for one reason only: to ensure that a customer stops payment. But that too was deceptive, as credit repair, when legitimately conducted, can only address inaccurate credit reporting, not the accurate delinquent payments that Wesley induces.

55.     Until the default reaches the point of recovery efforts by CV, Wesley sends ghost-written forms to the customer and has the customer send communications to CV, to regulatory agencies, or to other third parties pushing the narrative that the customer was lied to or misrepresented to, and are thus entitled to cancellation of the timeshare. Wesley does this to give the impression to the customer that Wesley is doing something. However, Wesley is merely waiting for default, and creating an illusion of a dispute that Wesley can later use as a basis to claim success when the timeshare owner eventually has his or her timeshare cancelled due to payment default and a recovery process by the timeshare company. Notably, Wesley's contract specifically characterizes a foreclosure by the timeshare company as a successful cancellation, justifying Wesley's fee.

56.     The ruse continues when Wesley conceals its involvement by way of threat to the timeshare owner—if the timeshare owner reveals its relationship with Wesley, Wesley will terminate the exit contract and will keep the advance fees already paid but never earned:

> **THE TERMS, CONDITIONS AND EXISTENCE OF THIS SERVICE AGREEMENT ARE CONFIDENTIAL AND YOU AGREE NOT TO DISCLOSE TO ANY PERSON OR ENTITY (INCLUDING BUT NOT LIMITED TO ANY PERSONS WORKING FOR OR AFFILIATED WITH OR FOR THE TIMESHARE ENTITY) THAT) YOU HAVE ENTERED INTO THIS SERVICE AGREEMENT OR ANY OF THE TERMS THEREOF. ANY BREACH OF THIS PARAGRAPH 7.c. OR ANY BREACH OF PARAGRAPH 1.b. OF THIS SERVICE AGREEMENT OR ANY DISCLOSURE BY YOU TO ANY PERSON OR ENTITY THAT WFG OFFERS A 100% MONEY BACK GUARANTEE IN THE EVENT YOUR PURCHASE AGREEMENT IS NOT TERMINATED WILL GIVE WFG THE RIGHT TO IMMEDIATELY TERMINATE THIS SERVICE AGREEMENT BY WRITTEN NOTICE TO YOU AND WFG WILL NOT BE REQUIRED TO REFUND ANY PORTION OF THE FEE TO YOU DUE TO THE BREACH OF THIS PARAGRAPH 7.c. OR THE BREACH OF PARAGRAPH 1.b.**

57.     Wesley directs the customers to send emails, letters, and other communications to the timeshare company, accusing it of deception during the sales process, regardless of the truth

of those accusations and without substantively investigating the customer's particular circumstances.

58.    CV reasonably believes that it, like other timeshare companies, has been subjected to Wesley's well-known common tactics. Wesley employees routinely call timeshare companies and impersonate their owners to deceive the timeshare company into believing it is talking to its own customers. During these contacts, Wesley employees make the prescribed accusations, irrespective of their veracity. Wesley has taken this even further by employing various technological tools, including, at various times, software that spoofs the customers' phone numbers and makes it appear on caller ID systems that Wesley is calling from the customer's phone number, and voice alteration devices to disguise its employees' voices in telephone calls placed to timeshare companies. Similarly, Wesley has used VPN scramblers and similar devices to conceal the IP address of Wesley computers that Wesley uses to access timeshare company websites in violation of applicable use agreements.

59.    Wesley's veil of secrecy is a uniform and essential business practice, employed not only against CV, but also against most every other timeshare company. Wesley must secrete itself because it knows that it is an unregulated, advance-fee business, the only function of which is to perpetrate tortious interference against CV, while defrauding its own customers.

60.    Wesley's scheme is therefore designed to be executed through deceptive advertising followed by false promises of relief, deceptive communications with CV, and false assurances to CV owners that they no longer owe any obligations to CV.

## C.    Defendant's Actions Have Damaged CV

61.    To date, Wesley's false advertising and hollow promises, and Wesley's deceptive and unfair trade practices, all as described above, individually and collectively, have caused identifiable CV owners to retain Wesley and, at Wesley's express or implied instruction, to stop making payments on their CV promissory notes and mortgages, and/or otherwise breach their

contractual obligations owed to CV. Wesley has engaged in deceptive and unfair trade practices in violation of various state laws. Wesley's actions have directly and proximately damaged CV in the form of CV owner's unpaid financial obligations, for Wesley's own pecuniary benefit. CV was further harmed by losing the ability to communicate with its own members and incurring costs associated with recovering defaulted interests.

62.    All conditions precedent to the filing of this action have been satisfied, waived, or have occurred.

63.    CV has retained the law firms of Greenspoon Marder LLP, and Turner Padget Graham and Laney, P.A. to represent it in this action and is obligated to pay reasonable attorneys' fees and costs incurred herein.

## COUNT I
## VIOLATION OF SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE §39-5-10, *et seq.*

64.    CV realleges and reincorporates the allegations contained in paragraphs 1 through 63 above as if more fully set forth herein.

65.    This is a cause of action for violations of the South Carolina Unfair Trade Practices Act, S.C. Code §39-5-10, *et seq.* ("SCUTPA"), against Wesley and McDowell, including unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

66.    CV is headquartered in Myrtle Beach, South Carolina and markets, sells, and/or manages over a dozen resorts in South Carolina. CV's South Carolina resorts are integral components of CV's multi-site vacation club in which the CV members who are deceived to become Wesley customers are members. The loss of CV member directly and adversely affects the Club and accordingly all of its composite resorts, including those in South Carolina.

67.    Wesley, McDowell, and CV are all "persons" as defined by S.C. Code §39-5-10(a).

68.     Wesley is engaged in "trade" and "commerce" as defined by S.C. Code §39-5-10(b).

69.     Wesley has engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

70.     At all times relevant herein, McDowell owned, managed and controlled Wesley's operations, and therefore directed Wesley's marketing and advertising decisions and the unfair competition and unfair and deceptive practices committed by Wesley in the conduct of its business, and is personally liable for them.

71.     Wesley purposefully inserts itself into the same marketplace in which CV operates—the timeshare industry consisting of existing timeshare owners. Wesley's false advertising is directed to CV's existing customers.

72.     Wesley advertises to CV's existing customer base, including those in South Carolina, in order to persuade them to engage Wesley, to dishonor their existing contracts with CV, and to divert monies from CV to Wesley.

73.     Wesley has engaged in unfair competition and unfair and deceptive acts or practices as set forth above and below and by:

a)      engaging in false and misleading advertisements, including as set forth above;

b)      leading customers to believe Wesley has vetted the customer's claim, if any, that the timeshare seller wronged them in connection with the timeshare purchase;

c)      leading customers to believe that any claimed wrongful conduct by the timeshare seller in connection with the timeshare purchase is what justifies stopping payments for the timeshare;

d)      leading customers to believe that any claimed wrongful conduct by the timeshare seller in connection with the timeshare purchase is what will cause or bring about cancellation of the timeshare;

e) leading customers to believe that Wesley has legal and other relevant experience;

f) instructing, suggesting to or inducing customers to stop making payments for the timeshare;

g) attempting to procure a cancellation of a timeshare based on payment default, foreclosure, inaction, or the passage of time, especially as Wesley does, without informing the customer that this is the method that Wesley has to offer;

h) entering into secrecy agreements with CV timeshare owners, or otherwise deliberately obscuring their role in advising CV timeshare owners to stop paying or otherwise breach their timeshare or related contracts;

i) ghostwriting emails, letters, and other communications to be sent by the Wesley customer to CV, or other third parties;

j) contractually requiring the Wesley customer to lie to CV about Wesley's involvement, under threat of forfeiture of thousands of dollars of pre-paid fees if they tell the truth;

k) promising or providing illusory credit repair and credit improvement services without complying with and violating existing state and federal laws;

l) impersonating CV timeshare owners, including spoofing their caller IDs, and in other ways, upon information and belief;

m) financially incentivizing customers to leave misleading reviews for Wesley's services, and then using those reviews to solicit new customers;

n) utilizing endorsements and testimonials that do not reflect the honest opinions, findings, beliefs, or experience of the endorser in violation of 16 C.F.R. Part 255.1(a);

o)   failing to disclose unexpected material connections between Wesley and its endorsers, including monetary payment and/or providing free or discounted services and/or products in violation of 16 C.F.R. Parts 255.1(d) and 255.5(a);

p)   failing to either rely on adequate substantiation that its endorsers' experiences are representative of what consumers will generally achieve with Wesley's services or clearly and conspicuously disclosing the generally expected performance in violation of 16 C.F.R. Part 255.2(b);

q)   taking actions that have the effect of distorting or otherwise misrepresenting what consumers think of Wesley's services and/or products in violation of 16 C.F.R. Part 255.2(d); and

r)   engaging in knowingly unlawful, fraudulent, false, and deceptive practices.

This enumeration is not intended to be exhaustive and additional false and misleading statements and deceptive acts and practices which CV will include in this claim and for which CV will seek relief herein are expected to be identified by continuing investigation and through discovery.

74.   Wesley knew or should have known that the above conduct was unfair competition and constitutes unfair and deceptive acts or practices.

75.   Wesley intended that the above conduct would induce another to rely and act on them, specifically, consumers such as CV owners.

76.   Wesley's conduct offends established public policy, is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers and businesses alike.

77.   Wesley's conduct constitutes unfair commercial practices, deception, fraud, false pretenses, misrepresentation and the known concealment and misrepresentation of material facts, all in violation of SCUTPA.

78.   As a direct and proximate result of Wesley's unfair competition and unfair and deceptive conduct outlined above, CV owners have been harmed and CV has been damaged.

Specifically, the harm Wesley has caused CV includes, but is not limited to: (1) losing members whose loss adversely impacts CV's Club and its composite resorts including the more than a dozen located in South Carolina; (2) losing the ability to communicate with its own members/owners; (3) incurring costs associated with recovering defaulted interests; (4) incurring carrying costs prior to sale; and (5) incurring marketing and sales costs associated with selling its inventory of timeshare interests.

79.     Wesley's conduct has also falsely induced CV owners to stop making payments to CV even though Wesley has no legal basis to advise its customers to stop paying on their obligations to CV. CV has been damaged in the amounts due and owing to it by virtue of the CV owners halting their payment of mortgage, maintenance, and/or tax payments at the instruction of Wesley.

80.     CV has a clear legal right or interest in being free from Wesley's unfair competition and unfair and deceptive conduct above that has harmed CV, and will result in future harm to CV if Wesley is not enjoined.

81.     Wesley is continuing to engage in the false, unfair, and deceptive conduct described above, and there is therefore a strong likelihood that CV will suffer irreparable harm on an ongoing basis, and any remedy at law for Wesley's perpetuation of the false, deceptive, and unfair conduct is inadequate.

82.     An injunction serves the public purpose.

83.     By this action, CV seeks the following specific relief:

a)      Enjoining Wesley and those persons in active concert or participation with it from:

(i)     engaging in false and misleading advertisements, including as set forth above;

(ii)    leading customers to believe Wesley has vetted the customer's claim, if any, that the timeshare seller wronged them in connection with the timeshare purchase;

(iii)   leading customers to believe that any claimed wrongful conduct by the timeshare seller in connection with the timeshare purchase is what justifies stopping payments for the timeshare;

(iv)   leading customers to believe that any claimed wrongful conduct by the timeshare seller in connection with the timeshare purchase is what will cause or bring about cancellation of the timeshare;

(v)    leading customers to believe that Wesley has legal and other relevant experience;

(vi)   instructing, suggesting to or inducing customers to stop making payments for the timeshare;

(vii)  stating or implying to customers that, as a result of not making payments for the timeshare, there is no penalty or other legal consequence, that any penalty or consequence will be short lived, or that Wesley will repair or ameliorate any penalty or consequence;

(viii) attempting to procure a cancellation of a timeshare based on payment default, foreclosure, inaction, or the passage of time, especially, as Wesley does, without informing the customer that this is the method Wesley has to offer;

(ix)   entering into secrecy agreements with CV timeshare owners, or otherwise deliberately obscuring their role in advising CV timeshare owners to stop paying or otherwise breach their timeshare or related contracts;

(x)    ghostwriting emails, letters, and other communications to be sent by the Wesley customer to CV, or other third parties;

(xi)    contractually requiring the Wesley customer to lie to CV about Wesley's involvement, under threat of forfeiture of thousands of dollars of pre-paid fees if they tell the truth;

(xii)    promising or providing illusory credit repair and credit improvement services without complying with and violating existing state and federal laws;

(xiii)    impersonating CV timeshare owners, including spoofing their caller IDs, and in other ways;

(xiv)    financially incentivizing customers to leave reviews for Wesley's services, and then using those reviews to solicit new customers;

(xv)    utilizing endorsements and testimonials that do not reflect the honest opinions, findings, beliefs, or experience of the endorser in violation of 16 C.F.R. Part 255.1(a);

(xvi)    failing to disclose unexpected material connections between Wesley and its endorsers, including monetary payment and/or providing free or discounted services and/or products in violation of 16 C.F.R. Parts 255.1(d) and 255.5(a);

(xvii)    failing to either rely on adequate substantiation that its endorsers' experiences are representative of what consumers will generally achieve with Wesley's services or clearly and conspicuously disclosing the generally expected performance in violation of 16 C.F.R. Part 255.2(b);

(xviii) taking actions that have the effect of distorting or otherwise misrepresenting what consumers think of Wesley's services and/or products in violation of 16 C.F.R. Part 255.2(d); and

(xix) engaging in knowingly unlawful, fraudulent, false, or deceptive practices.

b) Requiring Wesley to cease broadcasting, take down, and destroy all such false, misleading, and deceptive materials;

c) Directing Wesley to file with this Court and serve on CV within fifteen days after the injunction, a report, in writing under oath, setting forth in detail the manner and form in which Wesley has complied with the injunction;

d) Requiring Wesley to provide notice of such injunction by posting the Order on the websites used by Wesley and any websites which refer to and/or link to the websites used by Wesley;

e) A Judgment in favor of CV and against Wesley and McDowell for statutorily allowed monetary damages pursuant to S.C. Code §39-5-140(a);

f) A Judgment in favor of CV and against Wesley for treble its actual damages (*see* S.C. Code §39-5-140(a)); and

g) A Judgment in favor of CV and against Wesley and McDowell for attorneys' fees and costs pursuant to S.C. Code §39-5-140(a).

**WHEREFORE**, CV respectfully demands judgment in its favor and against Wesley, and request temporary and permanent injunctive relief, damages, attorneys' fees and costs, and such additional and further relief as this Court deems just and proper.

## COUNT II
## VIOLATION OF NORTH CAROLINA TIMESHARE ACT,
### N.C. Gen. Stat. § 93A-39, *et seq.*

84.     CV realleges and reincorporates the allegations contained in paragraphs 1 through 63 above as if more fully set forth herein.

85.     CV markets, sells, and/or manages over 14 resorts in North Carolina. All but three of CV's North Carolina resorts are components of CV's multi-site vacation club, such that when a CV Club member defaults or cancels, the Club and all of the component resorts, including those in North Carolina, are harmed.

86.     CV has had members residing in North Carolina that have worked with, and been victimized by, Wesley through the unfair and deceptive conduct described throughout this Complaint, which has in turn caused harm to CV as described herein.

87.     The North Carolina Timeshare Act, N.C. Gen. Stat. § 93A-39, *et seq.*, among other things, regulates the activities of timeshare exit companies, including Wesley.

88.     Wesley and McDowell are "transfer service providers," as defined by N.C. Gen. Stat. § 93A-41(49).

89.     Wesley enters into "timeshare transfer services agreements" with its customers, as defined by N.C. Gen. Stat. § 93A-41(46).

90.     Wesley and McDowell perform "timeshare transfer services," as defined by N.C. Gen. Stat. § 93A-41(45).

91.     Wesley and McDowell are "regulated parties," as defined by N.C. Gen. Stat. § 93A-41(26).

92.     Wesley's and McDowell's customers are "consumer timeshare resellers," as defined by N.C. Gen. Stat. § 93A-41(8).

93.     Wesley's and McDowell's customers own "consumer resale timeshares," as defined by N.C. Gen. Stat. § 93A-41(7).

94.    Wesley and McDowell are "persons," as defined by N.C. Gen. Stat. § 93A-41(22).

95.    CV is a "developer," as defined by N.C. Gen Stat. § 93A-41(9).

96.    CV is a "managing entity," as defined by N.C. Gen Stat. § 93A-41(18).

97.    North Carolina Gen. Stat. § 93A-68(a) prohibits certain conduct in the course of advertising, marketing, promoting, offering, sale, or performance of any timeshare transfer services, including the so-called timeshare exit services promoted and offered by Wesley.

98.    Wesley and McDowell violate N.C. Gen. Stat. § 93A-68(a), as detailed in the above factual recitation, which is incorporated by reference and includes but is not limited to:

a)    Advising, suggesting, or assisting with advising or suggesting that a consumer timeshare reseller (like CV timeshare owners) cease making any payment of assessments, ad valorem real estate taxes, or any other sums imposed against the consumer resale timeshare (maintenance fees owed to CV), or any payment of any amounts due to a mortgagee or other lienor under a mortgage or other lien or encumbrance secured by the consumer resale timeshare (payments to CV for financed timeshare purchases);

b)    Representing, expressly or by implication, that (i) a consumer timeshare reseller cannot or should not contact or communicate with the developer, managing entity, exchange company, mortgagee, or lienor or (ii) the developer, managing entity, exchange company, mortgagee, or lienor is prohibited from contacting or communicating with the consumer timeshare reseller;

c)    Offering, obtaining, negotiating, arranging, or assisting with offering, obtaining, negotiating, or arranging a timeshare transfer service that disposes of the consumer resale timeshare through foreclosure of the consumer resale timeshare for (i) the nonpayment of assessments, ad valorem real estate taxes, or any other

sums imposed against the consumer resale timeshare or (ii) nonpayment of amounts due to a mortgagee or other lienor under a mortgage or other lien encumbrance secured by the consumer resale timeshare; and

d)    Charging or accepting a fee for obtaining, negotiating, arranging, or assisting with obtaining, negotiating, or arranging the voluntary relinquishment of a consumer resale timeshare to a managing entity in lieu of payment of assessments or ad valorem real estate taxes.

99.    North Carolina Gen. Stat. § 93A-68(c) provides certain provisions that must be in all timeshare transfer services agreements that impact the North Carolina resorts including in the Club of which CV is the Developer. Because every CV Club contract includes the more than a dozen North Carolina timeshare resorts within the Club, all Wesley contracts with CV Club members are subject to these requirements.

100.    Wesley violates N.C. Gen. Stat. § 93A-68(c), by failing to include the following provisions in its timeshare transfer services agreements:

a)    A statement that no fee, cost, or other compensation may be received by or paid to the transfer service provider before the delivery to the consumer timeshare reseller of written evidence that all promised timeshare transfer services have been performed, including:

(i)    Delivery to both the consumer timeshare reseller and the timeshare program managing entity of a copy of the recorded timeshare instrument or other legal document evidencing the transfer of ownership of or legal title to the consumer resale timeshare to the transferee, accompanied by the full name, address, and other known contact information for the transferee; and

(ii)  Delivery to the consumer timeshare reseller of a copy of the legal document executed by the vendor or obligee evidencing the mutually agreed upon termination of the timeshare instrument or timeshare loan obligation relating to the consumer resale timeshare.

b)  The establishment of an escrow account for any advance payment of fees and the name, address, current phone number, and current email address of the independent escrow agent required by the North Carolina Timeshare Act;

c)  A specific, detailed description of each timeshare transfer service promised to be provided, including a statement of the last date by which each promised service will be fully performed, and including a statement that the transfer service provider will deliver to the consumer timeshare reseller written notice of the full performance of each timeshare transfer service, together with a copy of the legal document evidencing the completed performance of the service;

d)  The total cost to the consumer timeshare reseller of each timeshare transfer service promised to be provided, together with an itemized list of all of the fees and costs that comprise the total cost of that service;

e)  The terms or conditions of any refund, cancellation, exchange, or repurchase policy for a timeshare transfer service, including the circumstances under which a guaranteed or nonguaranteed, full or partial refund will be granted;

f)  A statement in conspicuous type that nonpayment of a timeshare loan obligation or assessment obligation may lead to a foreclosure action or other proceeding that could result in the loss of ownership of the timeshare and negative consequences for the consumer timeshare reseller's credit and tax liability; and

g)  A statement in substantially the following form in conspicuous type immediately preceding the space in the timeshare transfer services agreement provided for the

consumer timeshare reseller's signature: [Insert transfer service provider name] has agreed to provide you with timeshare transfer services under this timeshare transfer services agreement. After those services have been fully performed, the transfer service provider is obligated to provide you with written notice of full performance and a copy of the recorded instrument or other legal document evidencing the transfer or assignment of your timeshare, the termination of your timeshare contract, or the release from a timeshare loan or assessment obligation. Any fee or other compensation paid by you under this agreement before full performance by [Insert transfer service provider name] must be held in escrow by the escrow agent specified in this agreement, and the transfer service provider is prohibited from receiving any such fee or other compensation until all promised timeshare transfer services have been performed.

Timeshare Owner's Right of Cancellation

You have an unwaivable right to cancel this agreement for any reason within five days after the date you sign this agreement. If you decide to cancel this contract, you must notify [insert name of transfer service provider] in writing of your intent to cancel. Your notice of cancellation shall be effective upon the date sent and shall be sent to [insert name and mailing address of transfer service provider] or to [insert transfer service provider's email address]. Your refund will be made within 20 days after receipt of notice of cancellation or within five days after receipt of funds from your cleared check, whichever is later.

IMPORTANT: It is recommended that you contact your developer, managing entity, mortgagee, or lienor before signing this agreement. Your developer, management entity, mortgagee, or lienor may be willing to negotiate a payment

plan, restructure your debt obligation, or accept the transfer of your timeshare free of charge.

101.    North Carolina Gen. Stat. § 93A-68(d) provides that if the timeshare transfer services to be provided include relief to be obtained from the consumer timeshare reseller's managing entity, mortgagee, or lienor, the timeshare transfer service provider may not:

a)    Request or receive payment of any fee or other consideration until the consumer timeshare reseller has executed a written agreement between the consumer timeshare reseller and the consumer timeshare reseller's managing entity, mortgagee, or lienor incorporating the offer of relief the timeshare transfer service provider obtained from the managing entity, mortgagee, or lienor; and

b)    Fail to disclose, on a separate page, in conspicuous type, substantially the following statement at the time the timeshare transfer service provider furnishes the consumer timeshare reseller with the written agreement specified in subsection (c) of this section, the following:

Important Notice

This is an offer of relief we obtained from your [insert name of managing entity, mortgagee, or lienor]. You may accept or reject the offer. If you reject the offer, you do not have to pay us for this service. If you accept the offer, you will have to pay us [insert total amount] for this service.

102.    Wesley violates N.C. Gen. Stat. § 93A-68(d) by offering and providing timeshare transfer services that include relief to be obtained from the consumer timeshare reseller's managing entity, mortgagee, or lienor, the timeshare transfer service provider and:

a)    Requesting and/or receiving payment of any fee or other consideration before the consumer timeshare reseller has executed a written agreement between the consumer timeshare reseller and the consumer timeshare reseller's managing

entity, mortgagee, or lienor incorporating the offer of relief the timeshare transfer service provider obtained from the managing entity, mortgagee, or lienor; and/or

b)   Failing to disclose, on a separate page, in conspicuous type, substantially the following statement at the time Wesley furnishes the consumer timeshare reseller with the timeshare transfer services agreement, the following:

Important Notice

This is an offer of relief we obtained from your [insert name of managing entity, mortgagee, or lienor]. You may accept or reject the offer. If you reject the offer, you do not have to pay us for this service. If you accept the offer, you will have to pay us [insert total amount] for this service.

103.   North Carolina Gen. Stat. § 93A-68(f) requires that all funds that are received from or on behalf of a consumer timeshare reseller under a timeshare transfer services agreement shall be deposited into the escrow account.

104.   North Carolina Gen. Stat. § 93A-68(f) further provides that a fee, cost, or other compensation that is due or that will be paid to the transfer service provider must be held in the escrow account until the transfer service provider has fully complied with all of the obligations under the timeshare transfer services agreement and this section.

105.   Wesley violates N.C. Gen. Stat. § 93A-68(f) by failing to deposit in an escrow account all funds that are received from or on behalf of a consumer timeshare reseller under a timeshare transfer services agreement and/or failing to hold the fee, cost, or other compensation that is due or that will be paid to Wesley in an escrow account until Wesley has fully complied with all of the obligations under the timeshare transfer services agreement and the North Carolina Timeshare Act.

106.    North Carolina Gen. Stat. § 93A-68(h) requires an independent escrow agent to retain all timeshare transfer services agreements, escrow account records, and affidavits received pursuant to the North Carolina Timeshare Act for a period of five years.

107.    Wesley violates N.C. Gen. Stat. § 93A-68(h) by failing to use an independent escrow agent that retains all timeshare transfer services agreements, escrow account records, and affidavits received pursuant to the North Carolina Timeshare Act for a period of five years.

108.    North Carolina Gen. Stat. § 93A-68(i) provides that a transfer service provider, an agent or third-party service provider for the transfer services provider, or an independent escrow agent who intentionally fails to comply with the provisions of N.C. Gen. Stat. § 93A-68 concerning the establishment of an escrow account, deposits of funds into escrow, withdrawal therefrom, and maintenance of records is guilty of a Class E felony.

109.    Wesley and McDowell violate N.C. Gen. Stat. § 93A-68(i) by intentionally failing to comply with the provisions of N.C. Gen. Stat. § 93A-68 concerning the establishment of an escrow account, deposits of funds into escrow, withdrawal therefrom, and maintenance of records.

110.    North Carolina Gen. Stat. § 93A-68(o) provides that an owner, managing entity, or developer, which includes CV, may bring an action for injunctive relief and recover their reasonable attorneys' fees and costs against a timeshare service provider for a violation of N.C. Gen. Stat. § 93A-68.

111.    As a direct and proximate result of Wesley's conduct outlined above, CV owners and CV have been harmed. Specifically, the harm Wesley has caused CV includes, but is not limited to, (1) losing the ability to communicate with its own members/owners; (2) incurring costs associated with recovering defaulted interests; (3) incurring carrying costs prior to sale; and (4) incurring marketing and sales costs associated with selling its inventory of timeshare interests.

112.    Further, Wesley's wrongful conduct induced CV owners to stop making payments to CV. CV has been harmed in the amounts due and owing to them by virtue of the CV owners ceasing payments of purchase money financing and maintenance fees at Wesley's instruction.

113.    CV has a clear legal right or interest in being free from Wesley's conduct that violates the North Carolina Timeshare Act that has harmed CV, and will result in future harm to CV if Wesley is not enjoined.

114.    Wesley is continuing to engage in the unlawful conduct described above, and there is therefore a strong likelihood that CV will suffer irreparable harm on an ongoing basis, and any remedy at law for Wesley's perpetuation of the illegal conduct is inadequate.

115.    An injunction serves the public purpose.

116.    By this action, which incorporates the above allegations, CV seeks the following relief, including, but not limited to:

a)    Enjoining Wesley and those persons in active concert or participation with it from:

(i)    Advising, suggesting, or assisting with advising or suggesting that a consumer timeshare reseller cease making any payment of assessments, ad valorem real estate taxes, or any other sums imposed against the consumer resale timeshare, or any payment of any amounts due to a mortgagee or other lienor under a mortgage or other lien or encumbrance secured by the consumer resale timeshare;

(ii)    Representing, expressly or by implication, that (i) a consumer timeshare reseller cannot or should not contact or communicate with the developer, managing entity, exchange company, mortgagee, or lienor or (ii) the developer, managing entity, exchange company, mortgagee, or lienor is

prohibited from contacting or communicating with the consumer timeshare reseller;

(iii)    Offering, obtaining, negotiating, arranging, or assisting with offering, obtaining, negotiating, or arranging a timeshare transfer service that disposes of the consumer resale timeshare through foreclosure of the consumer resale timeshare for (i) the non-payment of assessments, ad valorem real estate taxes, or any other sums imposed against the consumer resale timeshare or (ii) nonpayment of amounts due to a mortgagee or other lienor under a mortgage or other lien encumbrance secured by the consumer resale timeshare;

(iv)    Charging or accepting a fee for obtaining, negotiating, arranging, or assisting with obtaining, negotiating, or arranging the voluntary relinquishment of a consumer resale timeshare to a managing entity in lieu of payment of assessments or ad valorem real estate taxes;

(v)    Entering into timeshare transfer services agreements that do not include the following provisions:

(A)    A statement that no fee, cost, or other compensation may be received by or paid to the transfer service provider before the delivery to the consumer timeshare reseller of written evidence that all promised timeshare transfer services have been per-formed, including:

(1)    Delivery to both the consumer timeshare reseller and the timeshare program managing entity of a copy of the recorded timeshare instrument or other legal document evidencing the transfer of ownership of or legal title to the

consumer resale timeshare to the transferee, accompanied by the full name, address, and other known contact information for the transferee; and

(2)     Delivery to the consumer timeshare reseller of a copy of the legal document executed by the vendor or obligee evidencing the mutually agreed upon termination of the timeshare instrument or timeshare loan obligation relating to the consumer resale timeshare.

(B)     The name, address, current phone number, and current email address of the independent escrow agent required by the North Carolina Timeshare Act;

(C)     A specific, detailed description of each timeshare transfer service promised to be provided, including a statement of the last date by which each promised service will be fully performed, and including a statement that the transfer service provider will deliver to the consumer timeshare reseller written notice of the full performance of each timeshare transfer service, together with a copy of the legal document evidencing the completed performance of the service;

(D)     The total cost to the consumer timeshare reseller of each timeshare transfer service promised to be provided, together with an itemized list of all of the fees and costs that comprise the total cost of that service;

(E)     The terms or conditions of any refund, cancellation, exchange, or repurchase policy for a timeshare transfer service, including the

circumstances under which a guaranteed or nonguaranteed, full or partial refund will be granted;

(F)    A statement in conspicuous type that nonpayment of a timeshare loan obligation or assessment obligation may lead to a foreclosure action or other proceeding that could result in the loss of ownership of the timeshare and negative consequences for the consumer timeshare reseller's credit and tax liability; and

(G)    A statement in substantially the following form in conspicuous type immediately preceding the space in the timeshare transfer services agreement provided for the consumer timeshare reseller's signature: [Insert transfer service provider name] has agreed to provide you with timeshare transfer services under this timeshare trans-fer services agreement. After those services have been fully performed, the trans-fer service provider is obligated to provide you with written notice of full performance and a copy of the recorded instrument or other legal document evidencing the transfer or assignment of your timeshare, the termination of your timeshare contract, or the release from a timeshare loan or assessment obligation. Any fee or other compensation paid by you under this agreement before full performance by [Insert transfer service provider name] must be held in escrow by the escrow agent specified in this agreement, and the transfer service provider is prohibited from receiving any such fee or other compensation until all promised timeshare transfer services have been performed.

Timeshare Owner's Right of Cancellation

You have an unwaivable right to cancel this agreement for any reason within five days after the date you sign this agreement. If you decide to cancel this contract, you must notify [insert name of transfer service provider] in writing of your intent to cancel. Your notice of cancellation shall be effective upon the date sent and shall be sent to [insert name and mailing address of transfer service provider] or to [insert transfer service provider's email address]. Your refund will be made within 20 days after receipt of notice of cancellation or within five days after receipt of funds from your cleared check, whichever is later.

IMPORTANT: It is recommended that you contact your developer, managing entity, mortgagee, or lienor before signing this agreement. Your developer, management entity, mortgagee, or lienor may be willing to negotiate a payment plan, restructure your debt obligation, or accept the transfer of your timeshare free of charge.

(vi)    providing timeshare transfer services that include relief to be obtained from the consumer timeshare reseller's managing entity, mortgagee, or lienor, the timeshare transfer service provider and:

(A)    Requesting and/or receiving payment of any fee or other consideration before the consumer timeshare reseller has executed a written agreement between the consumer timeshare reseller and the consumer timeshare reseller's managing entity, mortgagee, or lienor incorporating the offer of relief the timeshare transfer

service provider obtained from the managing entity, mortgagee, or lienor; and/or

(B) Failing to disclose, on a separate page, in conspicuous type, substantially the following statement at the time Wesley furnishes the consumer timeshare reseller with the timeshare transfer services agreement, the following:

Important Notice

This is an offer of relief we obtained from your [insert name of managing entity, mortgagee, or lienor]. You may accept or reject the offer. If you reject the offer, you do not have to pay us for this service. If you accept the offer, you will have to pay us [insert total amount] for this service;

(vii) failing to deposit in an escrow account all funds that are received from or on behalf of a consumer timeshare reseller under a timeshare transfer services agreement and/or failing to hold the fee, cost, or other compensation that is due or that will be paid to Wesley in an escrow account until Wesley has fully complied with all of the obligations under the timeshare transfer services agreement and the North Carolina Timeshare Act;

(viii) failing to use an independent escrow agent that retains all timeshare transfer services agreements, escrow account records, and affidavits received pursuant to the North Carolina Timeshare Act for a period of five years;

b) An award of CV's attorneys' fees and costs to be paid by Wesley and/or McDowell pursuant to Gen. Stat. § 93A-68(o); and

c)      Any such other relief as the court considers necessary and proper.

**WHEREFORE**, CV respectfully demand judgment in its favor and against Wesley and McDowell, and request permanent injunctive relief, damages, attorneys' fees and costs, and such additional and further relief as this Court deems just and proper.

## <u>JURY TRIAL DEMAND</u>

CV demands a jury trial.

TURNER, PADGET, GRAHAM & LANEY, PA

s/John S. Wilkerson, III
John S. Wilkerson, III, (Fed. ID No. 4657)
P.O. Box 22129
Charleston, SC 29413
Telephone:  (843) 576-2801
Email: jwilkerson@turnerpadget.com

Richard W. Epstein
*Pro Hac Vice motion forthcoming*
GREENSPOON MARDER LLP
200 E. Broward Blvd., Suite 1800
Fort Lauderdale, FL 33301
Telephone:  (954) 491-1120
Email: richard.epstein@gmlaw.com

Douglas R. Sargent
*Pro Hac Vice motion forthcoming*
GREENSPOON MARDER LLP
227 W. Monroe St., Suite 3950
Chicago, Illinois 60606
Telephone:  (773) 395-1548
Email: Doug.Sargent@gmlaw.com

ATTORNEYS FOR PLAINTIFF

May 15, 2024
Charleston, South Carolina